## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. |
| v. | ) ) | |
| TALMER BANCORP, INC., GARY TORGOW, DAVID T. PROVOST, GARY S. COLLINS, MAX A. BERLIN, JENNIFER M. GRANHOLM, PAUL E. HODGES III, RONALD A. KLEIN, BARBARA J. MAHONE, ROBERT H. NAFTALY, ALBERT W. PAPA, THOMAS L. SCHELLENBERG, ARTHUR A. WEISS, and CHEMICAL FINANCIAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public shareholders of

Talmer Bancorp, Inc. ("Talmer" or the "Company") against Talmer and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin the vote on a proposed transaction, pursuant to which Talmer will be acquired by Chemical Financial Corporation ("Chemical") (the "Proposed Transaction").

2.     On January 26, 2016, Talmer and Chemical issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated January 25, 2016 (the "Merger Agreement") to sell Talmer to Chemical.  Under the terms of the Merger Agreement, Chemical would acquire all outstanding shares of Talmer for the equivalent of $1.1 billion in stock and cash.  Specifically, Talmer shareholders will receive 0.4725 shares of Chemical stock and $1.61 per share in cash for each Talmer share they own (the "Merger Consideration").  The Merger Consideration is valued at $15.64 per share based on the January 25, 2016 Chemical closing price of $29.70.

3.     Despite the fact that representatives of the Company and Chemical have described the Proposed Transaction as a "merger of equals," the Board has agreed to sell Talmer for grossly inadequate consideration.  The inadequacy of the Merger Consideration is evidenced by the fact that: (i) as recently as January 6, 2016, an analyst at J.P. Morgan Chase & Co set a $21.00 price target for the Company, which is $5.36 above the purported Merger Consideration value stated in the joint press release; and (ii) Talmer stock traded as high as $18.48 on December 29, 2015, less

2

than a month before the announcement of the Proposed Transaction.

4.      Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise Chemical of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow Chemical three (3) business days to match any superior offer; and (iv) a provision requiring Talmer to pay a termination fee of $34 million if the Company decides to pursue a competing offer.  The collective effect of these provisions is to chill any potential post-deal market check.

5.      Additionally, Talmer insiders stand to gain handsomely from the Proposed Transaction.  Five members of the Talmer Board will be appointed to the board of directors of the combined entity, and certain Individual Defendants and Talmer executives will become executives and paid consultants to the combined entity.  Motivated by the lucrative incentives of continued employment and the ability to participate in the future of the combined entity, each member of the Board entered into voting agreements to, among other things, vote their Talmer shares in favor of the Proposed Transaction.

6.     Finally, compounding the unfairness of the Proposed Transaction, on March 31, 2016, Chemical filed a Registration Statement on Form S-4 (the "Registration Statement") with the U.S. Securities and Exchange Commission ("SEC"). The Registration Statement, which recommends that Talmer shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the valuation analyses prepared by the Company's financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW"), in connection with the rendering of its fairness opinion; (ii) Talmer management's and Chemical's projections, utilized by KBW in its financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the U.S. Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n, 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14-9, as shareholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

7.     In short, the Proposed Transaction is designed to unlawfully divest Talmer's public shareholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company shareholders. To remedy defendants' Exchange Act violations, Plaintiff

seeks to enjoin the shareholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

9.     This Court has personal jurisdiction over each defendant because the defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. § 1391, because: (i) Talmer is incorporated in Michigan and maintains its principal place of business in this District; (ii) each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) Plaintiff's claims arose in this District, where a substantial portion of the actionable

conduct took place, including defendants' primary participation in the wrongful acts detailed herein; (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (v) most of the documents are electronically stored and evidence exists in this District.

## PARTIES

11.     Plaintiff Stephen Bushansky is, and has been at all times relevant hereto, a continuous shareholder of Talmer.

12.     Defendant Talmer is a Michigan corporation with its principal executive offices located at 2301 West Big Beaver Road, Suite 525, Troy, Michigan 48084.   The Company, with assets of over $6.6 billion and over $5 billion in deposits, is the holding company for Talmer Bank and Trust ("Talmer Bank"), a Michigan state-chartered bank insured by the Federal Deposit Insurance Corporation ("FDIC").  Established in 2007 as First Michigan Bank, Talmer Bank has 81 banking offices in Michigan and northeastern Ohio.  The Company's common stock is traded on the NASDAQ under the ticker symbol "TLMR."

13.     Defendant Gary Torgow ("Torgow") has been a director of the Company and Chairman of the Board since December 2009.

14.     Defendant David T. Provost ("Provost") has been a director, President and Chief Executive Officer ("CEO") of Talmer since December 2009.  Defendant Provost was appointed CEO of Talmer Bank in early 2008, and was subsequently named Chairman of Talmer Bank in December 2009.

15.     Defendant Gary S. Collins ("Collins") has been a director of the Company and Vice Chairman of the Board since March 2011.

16.     Defendant Max A. Berlin ("Berlin") has been a director of the Company since April 2010.  Defendant Berlin is a member of the Audit and Compensation Committees.

17.     Defendant Jennifer M. Granholm ("Granholm") has been a director of the Company since August 2013.  Defendant Granholm is a member of the Audit and Nominating and Corporate Governance Committees.

18.     Defendant Paul E. Hodges III ("Hodges") has been a director of the Company since April 2010.

19.     Defendant Ronald A. Klein ("Klein") has been a director of the Company since April 2010.  Defendant Klein is a member of the Compensation Committee.

20.     Defendant Barbara J. Mahone ("Mahone") has been a director of the Company since March 2013.  Defendant Mahone serves as Lead Director and is a member of the Audit and Compensation Committees.

21.     Defendant Robert H. Naftaly ("Naftaly") has been a director of the Company since April 2010. Defendant Naftaly is Chairman of the Audit Committee.

22.     Defendant Albert W. Papa ("Papa") has been a director of the Company since April 2010. Defendant Papa is Chairman of the Nominating and Corporate Governance Committee.

23.     Defendant Thomas L. Schellenberg ("Schellenberg") has been a director of the Company since April 2010. Defendant Schellenberg is Chairman of the Compensation Committee and a member of the Audit Committee.

24.     Defendant Arthur A. Weiss ("Weiss") has been director of the Company since May 2007. Defendant Weiss is a member of the Nominating and Corporate Governance Committee.

25.     The defendants identified in paragraphs 13 through 24 are collectively referred to herein as the "Board" or the "Individual Defendants."

26.     Defendant Chemical is a Michigan corporation with its principal place of business at 333 East Main Street, Midland, Michigan 48640. Chemical's subsidiary Chemical Bank, a Michigan state-chartered bank insured by the FDIC, operates 185 banking offices in Michigan.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Talmer common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

29.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of January 21, 2016, there were approximately 66,129,873 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Talmer or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

30.    Questions of law and fact are common to the Class, including, among others, whether the Registration Statement is materially false and misleading.

31.    Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the other members of the Class have sustained damages as a

result of defendants' wrongful conduct as alleged.

32.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

34.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

35.     Talmer is the bank holding company for Talmer Bank, a Michigan state-chartered bank insured by the FDIC.  Established in 2007 as First Michigan Bank, Talmer Bank has 81 banking offices in Michigan and northeastern Ohio.  The Company is headquartered in Troy, Michigan.

36.     The Company offers and is involved in numerous lending products and

activities.  As of December 31, 2015 Talmer has over $6.6 billion in assets and over $5 billion in deposits.

37.     Talmer has enjoyed a substantial growth in assets over the past several years.  A November 23, 2014 *Detroit Free Press* article highlighted the Company's remarkable growth of assets by more than 7,000% over the previous five years.  According to the article, research firm SNL Financial declared that Talmer had the fastest growth rate by assets of all publicly-traded U.S. banks and thrifts, with five-year asset growth of 7,763% from the second quarter of 2009 through the second quarter of 2014.  Talmer's growth was driven in part by its seven acquisitions, including four FDIC-assisted deals to acquire failed banks.

38.     An article published by the *Milwaukee Journal Sentinel* detailed the Company's focus on failed-bank acquisitions, noting: "[w]ith four failed-bank acquisitions under its belt so far - three in Michigan and one in Wisconsin - Talmer is just getting started."

39.     In a presentation filed with the SEC on January 26, 2016, Talmer and Chemical touted the positive transformation of the Company, as seen in the following slide:



40.     Talmer's shares have been trading at an upward trajectory over the past several years.  As seen in the chart below, the Company has seen a robust market for its stock with its shares trading as high as $18.48 on December 29, 2015:



41.    The Company's recent financial results underscore its promising prospects.  On July 30, 2015, the Company reported its financial results for the second quarter of 2015.  For the quarter, Talmer enjoyed net income of $17.5 million, or $0.23 per diluted share, as compared to net income of $9.4 million, or $0.12 per diluted share during the previous quarter.  The Company's net total loans grew by $86.6 million.  Total deposits increased $129.5 million, to $4.9 billion as of June 30, 2015, compared to March 31, 2015.  Commenting on the impressive financial results, defendant Provost stated:

> We are pleased with underlying trends this quarter including strong core deposit growth, improved operating expense trends, quality loan growth and solid revenue trends from our fee businesses.  Core deposit trends benefited from the continued focus of our retail sales force to drive growth in key markets in order to fund our strong lending pipelines.  Second quarter loan growth trends were somewhat mitigated by the strategic sale of $49.9 million of long-term residential mortgages

out of our held for investment portfolio. Also, overall balances of commercial real estate loans declined as we focus on increasing our proportionate exposure to commercial and industrial lending. Net interest income trends were negatively impacted by higher levels of prepayments, excess liquidity and the negative yield of the FDIC indemnification asset. Looking forward, margin and revenue trends should benefit from the July 1, 2015 expiration of the first and largest of our four non-single family FDIC loss sharing agreements. Our reported earnings were impacted by several non-core items: a $3.1 million benefit to earnings due to the change in fair value of our loan servicing rights, $419 thousand in bank acquisition and due diligence fees and $1.8 million of net expense related to the rationalization of corporate real estate including sales, impairments and lease terminations. The cumulative impact to our earnings per diluted common share for the second quarter of 2015 from these non-core items was a benefit of approximately $0.01 per diluted common share. We expect to see an incremental improvement in our core operating efficiency in the third quarter reflecting the impact of continuing expense management, improving net interest income trends and additional savings related to the charter consolidation of Talmer West Bank, which will be completed in August. Our team remains optimistic about the substantial growth opportunities in our existing markets and continues to be well-prepared to pursue additional acquisitions.

42.     The positive news continued for Talmer shareholders. On October 28, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015. Talmer reported net income of $20.0 million, or $0.27 per diluted share, as compared to net income of $19.5 million, or $0.26 per diluted share year over year. The Company reported an increase in net total loans by $173.7 million, driven by strong growth in both commercial and industrial and commercial real estate lending. Total deposits increased $217.4 million, to $5.1 billion as of

September 30, 2015, compared to June 30, 2015.  Commenting on these favorable

results, defendant Provost remarked:

> We are pleased with underlying trends this quarter including strong
> core deposit growth, declines in operating expenses and solid revenue
> trends.  Core deposit growth benefited from the continued focus of our
> retail sales force to drive growth in key markets in order to fund our
> lending pipelines.  Our reported earnings were impacted by two key
> non-core items:  a $3.8 million detriment to earnings, or an after-tax
> amount equal to approximately $0.034 per diluted share, due to the
> change in fair value of our loan servicing rights, and an approximate
> $0.032 benefit to diluted earnings per share as a result of approximately
> $2.3 million in lower than normal income tax expense for the quarter.
> We also accomplished a number of significant strategic initiatives
> during the quarter including the charter consolidation of Talmer West
> Bank into Talmer Bank and Trust, the repurchase of $75.0 million of
> our Class A common stock and the final divestiture of our former lead
> investor, WL Ross and Co.  Going forward, we continue to be keenly
> focused on driving healthy organic franchise growth and being well-
> prepared for potential acquisition opportunities.

43.     On December 28, 2015, the Company announced the early termination

of its loss share agreements with the FDIC.  Talmer entered into the loss share

agreements in 2010 and 2011 in connection with its acquisition of assets and

assumption of liabilities of four failed banks from the FDIC, as receiver.  The

Company and the FDIC also agreed to terminate the warrant to purchase 390,000

shares of Talmer's common stock issued to the FDIC in connection with its first

acquisition from the FDIC.  Under the early termination agreement, Talmer paid

$11.7 million to the FDIC as consideration for the early termination of the loss share

agreements, and under the warrant termination agreement, the Company paid $4.6

million to the FDIC as consideration to terminate all outstanding warrants.  The early termination eliminated further negative accretion on the FDIC indemnification asset, which totaled $26.4 million for the year ended December 31, 2014 and $22.2 million for the nine months ended September 30, 2015.  Commenting on the early termination agreement, defendant Provost stated:

> We are pleased to have reached an agreement with the FDIC that is a mutually beneficial conclusion to our partnership with the FDIC with respect to our failed bank acquisitions.  We view this transaction as a sound financial decision, as our one-time termination expenses will be offset by the elimination of both future negative accretion of the FDIC indemnification asset and loss share administration costs, with an anticipated tangible book value earn-back period of approximately five quarters and the elimination of outstanding warrants from our capital structure.  Other additional benefits of loss share termination will include the greater financial transparency and comparability to our peers.

44.     An article published by *Zacks Equity Research* on January 5, 2016 examined why Talmer is a "great momentum stock."  The reasons provided for Talmer's "solid momentum" included:

(a)     Talmer beat out the industry at large over the previous 12 weeks by a margin of 7.2% to 3.1%, while also outperforming when looking at the past year, putting up a gain of 29%.

(b)     Over the previous month, earnings per share ("EPS") estimates for Talmer Bancorp had gone up by 8.9% compared to flat industry average move,

suggesting that not only is the Company heading in the right direction, but it is seeing an increase relative to the industry too.

(c)     Over the previous two months, two earnings estimates had gone higher compared to none lower for the full year, while three estimates moved upwards with no downward revision for the next year time frame. These revisions helped boost the consensus estimate, as two months prior, Talmer was expected to post earnings of 95 cents per share for the full year— while at the time the article was published the Company looked to have EPS of 97 cents for the full year, representing a solid increase for investors.

45.     On January 26, 2016, Talmer issued a press release announcing its financial results for the fourth quarter of 2015.  The Company reported net income of $13.1 million, or $0.19 per diluted share, as compared to net income of $12.5 million, or $0.16 per diluted share year over year.  Talmer also reported an increase in net loans by $107.0 million, driven by strong growth in commercial and industrial lending, partially offset by acquired loan run-off.  During Talmer's fourth quarter 2015 earnings call on January 26, 2016, defendant Provost commented on the impressive results:

> We are very pleased with the strong profitability and underlying trends this quarter. Over the last year we have substantially reduced our dependence on non-core funding while simultaneously growing deposit balances to fund our loan growth. In the fourth quarter, net total loans increased by $107 million, the CNI loans representing the largest contributor to the growth.

Our core efficiency ratio, as described in the release, was 59.5% in the fourth quarter compared to 67.1% in the same quarter last year. Additionally, Talmer's Bancorp's Board of Directors approved an increase in our quarterly cash dividend to $0.05 from $0.01 previous expense.

**The Flawed Sale Process**

46.     From inception, the Board performed a fundamentally flawed process to sell the Company. While the Board had the opportunity on multiple occasions to canvass the market to determine whether higher value was attainable for the Company's assets and to its shareholders, the Board members engaged a conflicted financial advisor and acted to benefit their own interests.

47.     According to the Registration Statement, in May 2014, Talmer's financial advisor, KBW, engaged in discussions with Chemical's Chairman, CEO, and President, David B. Ramaker ("Ramaker"), regarding a potential merger between Chemical and Talmer. KBW is conflicted, as it was serving as Chemical's financial advisor on various engagements at the same time it was advising Talmer. For example, KBW served as Chemical's financial advisor in connection with its acquisitions of Northwestern Bancorp and Monarch Community Bancorp, Inc., which were announced on March 11, 2014 and November 4, 2014, respectively, and were consummated on October 31, 2014 and April 1, 2015, respectively. KBW also served as Chemical's financial advisor in connection with Chemical's acquisition of

Lake Michigan Financial Corporation, which was announced on January 6, 2015 and consummated on May 31, 2015.

48.    Additionally, while undisclosed in the Registration Statement, KBW has had a longstanding relationship with Chemical.  Among other things, KBW served as Chemical's financial advisor in connection with: (i) Chemical's acquisition of branches from First Financial Bancorp, announced on May 12, 2006 and consummated on August 18, 2006; (ii) Chemical's acquisition of O.A.K. Financial Corporation, announced on January 8, 2010 and consummated on April 30, 2010; and (iii) Chemical's acquisition of twenty-one branches from Independent Bank Corporation, announced on May 23, 2012 and consummated on December 7, 2012.

49.    Throughout 2014 and 2015, defendants Torgow and Provost, as well as Dennis Klaeser ("Klaeser"), Talmer's Chief Financial Officer ("CFO"), and Thomas Shafer ("Shafer"), the Company's Chief Operating Officer, met with representatives of Chemical to negotiate the Proposed Transaction.  However, each of these individuals who led the negotiations on behalf of Talmer suffers from conflicts of interest, and the discussions they held focused on their post-merger positions with Chemical.  Following the completion of the Proposed Transaction, among other things: (i) Torgow will serve as Chairman of the Chemical board of directors and stands to receive $1,185,554 in golden parachute compensation; (ii) Provost will serve on Chemical's board of directors, will become Vice Chairman of Growth

Strategy of Chemical, will continue to serve as CEO of Talmer Bank, and stands to receive $1,185,554 in golden parachute compensation; (iii) Klaeser will become Chief Strategy Officer of Chemical, will continue to serve as CFO of Talmer Bank, and stands to receive $2,808,607 in golden parachute compensation; (iv) Shafer will serve as Executive Vice President of the surviving bank and stands to receive $1,499,789 in golden parachute compensation; and (v) Klaeser and Shafer will receive substantial lump sum cash change in control payments, estimated to equal $1,984,307 and $803,266, respectively.

50.     On August 15, 2014, defendant Provost and Ramaker met to discuss the potential combination of Talmer and Chemical.

51.     On September 24, 2014, defendants Torgow, Provost, and Klaeser met with Ramaker and Chemical's CFO, Lori A. Gwizdala ("Gwizdala"), to discuss "the respective cultures and governance of Chemical and Talmer, including how the respective cultures and governance of each organization might assimilate together following a potential business combination."

52.     In November 2014, the Board formed a Strategic Initiatives Committee comprised of Individual Defendants Klein and Mahone as well as David Leitch ("Leitch").[1]   Despite the formation of this purportedly independent committee,

_____

[1] Following Leitch's November 2015 resignation from the Board, defendant Papa joined the Strategic Initiatives Committee.

20

conflicted defendants Torgow, Provost, Klaeser, and/or Shafer attended *all* of the Strategic Initiatives Committee meetings.

53.    In February 2015, Klaeser had discussions with Gwizdala regarding the potential combination with Talmer.

54.    On October 26, 2015, the Talmer Strategic Initiatives Committee held a meeting attended by defendants Torgow, Provost, and Klaeser.  At this meeting, they discussed the potential merger with Chemical and the governance of the post-transaction company.

38.    On November 17, 2015, defendant Provost and Ramaker met and discussed certain aspects relating to a proposed strategic transaction, including "corporate culture" and "operating structure."  They met again on November 25 to discuss similar issues, including "potential cultural differences."

39.    On December 22, 2015, the Talmer Strategic Initiatives Committee held a meeting attended by defendants Torgow, Provost, Klaeser, and Shafer and discussed management structure, board composition, headquarters location, employees, and employment contracts.  The Strategic Initiatives Committee approved a letter of intent with Chemical that contemplated merger consideration of 90% Chemical stock and 10% cash, with an exchange ratio between 0.50 and 0.525 Chemical shares for each Talmer share.

40.    On January 25, 2016, the Talmer Compensation Committee met regarding and approved employment services agreements with defendants Torgow, Provost, and Klaeser.   The Registration Statement fails to disclose when these agreements were drafted and negotiated.

41.    Later in the day on January 25, 2016, the Board held a meeting that was also attended by Klaeser and Shafer.   The Board unanimously approved the Proposed Transaction with Chemical, and the Board caused the Company to enter into the Merger Agreement.

## The Proposed Transaction is Inadequate

55.    On January 25, 2016, following the Board's approval, Talmer entered into the Merger Agreement with Chemical for inadequate consideration.   The next day, Talmer and Chemical issued a joint press release stating, in relevant part:

> MIDLAND, Mich. and TROY, Mich., Jan. 26, 2016 -- The boards of directors of Chemical Financial Corporation (Nasdaq: CHFC), the holding company for Chemical Bank, and Talmer Bancorp, Inc. (Nasdaq: TLMR), the holding company for Talmer Bank and Trust, today announced the execution of a definitive agreement for Chemical Financial Corporation ("Chemical") to partner with Talmer Bancorp, Inc. ("Talmer") in a cash and common stock merger transaction valued at approximately $1.1 billion.
>
> The merger will result in the creation of one of the largest community banks in the Midwest. Based on the companies balance sheets as of December 31, 2015, following completion of the transaction, the combined organization will have approximately $16 billion in assets, $12 billion in loans and $13 billion in deposits with 266 locations primarily in Michigan and northeast Ohio.  The transaction will also allow the combined company to more effectively and efficiently

navigate the challenges and costs associated with becoming a larger banking institution.

Upon consummation of the merger, David B. Ramaker will continue to serve as CEO and President of Chemical Financial Corporation and Chairman, CEO and President of Chemical Bank.  David T. Provost, Talmer's President and CEO and Chairman of Talmer Bank, will join the Chemical board of directors. Gary Torgow, Talmer's Chairman, will serve as Chairman of the Board of the combined entity.

Under the terms of the definitive agreement, Chemical will acquire all of the outstanding shares of Talmer common stock for common stock and cash in a transaction currently valued at approximately $1.1 billion, or $15.64 per share, based on the closing price of Chemical of $29.70 per share as of January 25, 2016. Talmer shareholders will receive 0.4725 shares of Chemical common stock and $1.61 per share in cash. Subject to receipt of regulatory approvals and satisfaction of other customary closing conditions, including approval of both Chemical and Talmer shareholders, the transaction is anticipated to close in the second half of 2016.

Chemical anticipates the transaction, with cost savings fully phased in, to be accretive to its earnings per share by approximately 8 percent in the first full year (excluding acquisition-related and integration costs associated with the transaction). Chemical expects net cost savings to reach an annual run rate of approximately $52 million. Pre-tax acquisition-related and integration costs associated with the transaction are expected to total approximately $62 million. Chemical estimates the tangible book value earn-back period to be approximately 3.25 years.

* * *

After the closing, Chemical intends to consolidate Talmer Bank and Trust into Chemical Bank, and operate under the Chemical Bank name. Talmer Bank and Trust will operate as a separate subsidiary of Chemical between the closing date and the conversion of data processing systems. Five members of the Talmer board of directors will join Chemical's board upon completion of the transaction, bringing the total number of Chemical board members to 12.

* * *

Combining Chemical's 185 Michigan branches with Talmer's 51 Michigan locations will result in the state's third largest branch delivery system, while the entities' combined of approximately $10.8 billion in Michigan deposits, would make it the sixth largest bank, by deposits, in the state and the only one of those six headquartered in Michigan. In addition to expanding Chemical's delivery system in its upper, central and southwest Michigan regions, the merger will introduce the Chemical brand to the southeast Michigan and northern Ohio markets, where it will have 31 and 27 branches, respectively.

56.    Upon completion of the Proposed Transaction, Chemical shareholders will own approximately 55% of the shares of the combined company and Talmer shareholders will own approximately 45%.

57.    In the joint press release, Chemical President and CEO Ramaker commented on the benefits Chemical will enjoy as a result of the Proposed Transaction:

> This is clearly a transformational merger between two healthy Michigan banks with complementary geographies. We have been impressed by what Gary Torgow, Dave Provost and the Talmer team has accomplished in a relatively short period of time, growing Talmer into one of the region's leading financial institutions. We were even more impressed by the manner in which they did so: building a strong core banking organization with talented commercial bankers and an attractive customer base … Through this partnership, we will make a marked entry into the southeast Michigan market, and expand for the first time beyond our State's borders. While Talmer's operations across Michigan clearly support our goal of being "Michigan's Community Bank," its operations in Northern Ohio and other contiguous states should position us well for future growth in those markets in the years ahead. We expect complementary strengths in specialty business lines such as wealth management and mortgage banking will lead to organic growth opportunities across the newly expanded franchise.

24

58.     A presentation filed with the SEC on January 26, 2016 further touted the benefits Chemical will enjoy as a result of the Proposed Transaction, as seen in the following slide:





59.     Upon consummation of the Proposed Transaction, Chemical will cross the $10 billion in assets threshold that exposes banks to additional regulatory scrutiny under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")—which will result in higher regulatory compliance costs for the combined entity.

60.     Market reaction to the Proposed Transaction was markedly negative, with Talmer shares trading as low as $14.58 the day after the Proposed Transaction was announced—over 11% lower than its unaffected closing price of $16.52 on January 22, 2016.

61.     The $15.64 per share implied value of the Merger Consideration is a significant discount to Talmer's trading price of $18.48 on December 29, 2015, less than a month prior to the announcement of the Proposed Transaction.

62.     Moreover, as recently as January 6, 2016, analyst Steven Alexopoulos ("Alexopoulos") at J.P Morgan Chase & Co.—rated by *Business Insider* as among "The Best Stock Analysts in America"—set a $21.00 target price for Talmer, which is $5.36 above the $15.64 implied value of the Merger Consideration stated in the joint press release.  Other price targets include: (i) a $21.00 price target as of December 29, 2015 by analyst David J. Long of Raymond James Financial, Inc.; (ii) a $21.00 price target as of December 29, 2015 by analyst Jon G. Arfstrom of RBC Capital Markets; (iii) a $19.50 price target as of December 28, 2015 by analyst Christopher E. McGratty of KBW; and (iv) a $19.00 price target as of December 29, 2015 by analyst John Rodis of FIG Partners LLC.

63.     In answering a question from Alexopoulos during the January 26, 2015 earnings call, defendant Provost conceded that the Board did not shop the Company in a value maximizing sale process before agreeing to the Proposed Transaction, as

seen in the below transcript excerpt:

> Steven Alexopoulos
>
> Okay. My question is for David Provost. David most of us are quite surprised over the price you're selling the bank. It seems like a great deal for Chemical their stock's up over 2% now, you're is down 4%. Did you shop the company and look for sale opportunities that would have offered a better deal for your shareholders?
>
> David Provost
>
> No. We view this as a fantastic deal for our shareholders. We're looking at combining with a great company, we don't look at it as a sale, we look at it as a merger of equals. So we're taking the best of both companies, we get a lot of cost savings, we get this over the $10 billion mark, so it wasn't a shop situation, we view this as a great transaction.

64.     Subsequently on the earnings call, Deutsche Bank AG Portfolio Manager Richard Glass ("Glass") expressed the disappointment of his institution as a Talmer shareholder, noting that the Company is being sold at a distressed price when the Company is performing well.  Commenting on the claim that the Proposed Transaction is a "merger of equals," Glass stated: "[i]f this is a merger of equals, one party is clearly more equal than the other."  Glass also questioned whether the Board is upholding its fiduciary duties and why a sale process was not conducted.  Glass explained:

> As Talmer shareholders, **we are incredibly disappointed**. If this is a merger of equals, you guys can call it what you want, but if this is a merger of equal, one party is clearly more equal than the other. You guys are **selling for a distressed price** or what looks like a distressed price of **below 1.5 times tangible book value** after reporting good earnings, **so it doesn't seem like there should be a distressed sale here**.

The fact that you guys did not take this out for process, besides the fact the bankers should be ashamed of themselves, really leads me to think *that the board and management are not upholding their fiduciary duty*. Your fiduciary duty is to the existing shareholders, not to the future company and combined entity. The fiduciary duty is clearly to the *Talmer shareholders and not taking this out and seeing what you can get if there is a better offer out there is not holding up your responsibilities*.

From our perspective, *the valuation is not great at all. I'd say it's lousy*. Page 10 looks like a wonderful slide, but *it looks like a wonderful slide if you are a CHFC shareholder*, not if you're a Talmer shareholder. So quite honestly I don't know why -- I haven't heard any explanation why the institutional shareholders and all the shareholders on the Talmer side shouldn't vote this deal down. *There has been no explanation of why this is a good deal for Talmer shareholders now*. If you guys want to hit the exit that's fine, but *at least run a process so we can get a fair valuation for our company*. As the previous analyst had noted, is growing loans very quickly and doesn't really have these problems that you would think this valuation implies, so maybe you can explain why from a Talmer shareholder perspective this is a good deal.

Emphasis added.

## The Board Impermissibly Locked Up the Proposed Transaction

65.   The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Talmer's public shareholders with no meaningful change of control premium for their shares.  When viewed collectively, these provisions, which are detailed below, further the interests of Chemical, certain Individual Defendants and other Talmer insiders to the detriment of Talmer's public shareholders and cannot represent a justified, appropriate or proportionate response to any threat

posed by a potential third party bidder.

66.    The Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents Talmer from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 6.9(a));

- An "information rights" provision that requires the Company to promptly advise Chemical of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.9(b));

- A "matching rights" provision that allows Chemical three (3) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation (Merger Agreement, Section 6.9(e)); and

- A termination fee of $34 million payable by the Company to Chemical if Talmer decides to pursue a competing bid (Merger Agreement, Section 8.2).

67.    The $34 million termination fee serves as a boon for Chemical, rather than making it whole should the Proposed Transaction not go through.

68.    The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision, and the termination fee unfairly restrain the Individual

Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

69.     The reason behind these deal protection devices is clear: the absence of a meaningful premium for shareholders creates the very real potential that a third party bidder will attempt to usurp Chemical and submit a higher bid for Talmer. The possibility that a third-party bidder will emerge motivated Chemical to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Chemical could purchase the Company for less than would otherwise be possible.

70.     Moreover, in connection with the Proposed Transaction, Chemical has entered into a voting agreement with each member of the Board. Under the terms of the voting agreements, the Company insiders have agreed to vote all of their shares, which constitute approximately 11.9% of Talmer's outstanding shares, in favor of the Proposed Transaction.

71.     Taken as a whole, the foregoing deal protection devices and the voting agreements essentially foreclose the possibility that a third-party "white knight"

could step forward to provide Talmer shareholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

## The Registration Statement Contains Numerous Material Misstatements or Omissions

72.     Compounding the unfair sale process and inadequacy of the Merger Consideration, the defendants also filed the materially incomplete and misleading Registration Statement with the SEC and disseminated it to Talmer's shareholders. The Registration Statement misrepresents or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction.

73.     Specifically, as set forth below, the Registration Statement fails to provide Company shareholders with material information or provides them with materially misleading information concerning: (i) the valuation analyses prepared by KBW in connection with the rendering of its fairness opinions; (ii) Talmer management's and Chemical's projections, utilized by KBW in its financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  Accordingly, Talmer shareholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

74.     The Registration Statement contains a written fairness opinion provided by KBW, and describes the various valuation analyses the financial advisor

performed in support of its opinion.  However, the description of KBW's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Talmer's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion rendered in support of the Proposed Transaction.

75.    With respect to KBW's *Selected Companies Analysis*, the Registration Statement fails to disclose:

(a)    the observed company-by-company pricing multiples and financial metrics examined by KBW, as well as any other multiples KBW examined; and

(b)    the per share value ranges for Talmer resulting from this analysis.

76.    With respect to KBW's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose:

(a)    the estimated cash dividends for Talmer and the pro forma combined company for years 2016 through 2021.

77.    With respect to KBW's *Selected Transactions Analysis*, the Registration Statement fails to disclose:

(a)    the observed transaction-by-transaction enterprise values as well as the pricing multiples and financial metrics for the selected transactions; and

(b)    the per share value ranges for Talmer resulting from this analysis.

78.    The Registration Statement is false or misleading as, without such undisclosed information, Company shareholders cannot evaluate for themselves whether the financial analyses performed by KBW were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, shareholders require this information in order to fully evaluate the extent to which KBW's opinion and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

79.    Additionally, the Registration Statement does not disclose material information concerning Talmer and Chemical management's financial projections.

80.    For example, the Registration Statement fails to disclose Talmer management's financial projections for years 2018-2021.

81.    This information is integral to shareholders' evaluation of the Merger Consideration.   Indeed, these financial projections provide a sneak peek into Talmer's expected future performance (*i.e.*, growth/profitability) and, consequently, its value as a standalone entity.   More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that

financial projections are among the most highly sought after disclosures by shareholders in the context of corporate transactions such as this.

82.    Similarly, the Registration Statement fails to disclose the Chemical projections, which were relied upon KBW for purposes of its analyses.  According to the Registration Statement, KBW utilized "'street estimates' . . . of Chemical for 2016 and 2017, well as assumed long term growth rates provided to KBW by Chemical management, all of which information was discussed with KBW by such management and used and relied upon by KBW based on such discussions, at the direction of Talmer management and with the consent of the [Board]."

83.    In addition, the Registration Statement fails to disclose the "estimates regarding certain pro forma financial effects of the merger on Chemical (including, without limitation, the cost savings and related expenses expected to result or be derived from the merger) that were prepared (in consultation with Chemical management) by, and provided to and discussed with KBW by, the management of Talmer, and used and relied upon by KBW at the direction of Talmer management and with the consent of the [Board]."  *See* Registration Statement at 70.

84.    Finally, with respect to the sale process that led to the Proposed Transaction, the *Background of the Merger* section of the Registration Statement is materially deficient in that it fails to disclose:

(a)    how many parties KBW identified in or around April 2015 that "might have interest in exploring a potential transaction with Talmer" and how many parties KBW contacted on Talmer's behalf in connection with the sale process;

(b)    the reasons why Talmer management apparently never followed up with "Institution B" and "Institution C" after late 2015, despite the fact that both parties indicated interest in a potential business combination with Talmer but cited concerns regarding timing;

(c)    whether the Company entered into any nondisclosure agreements with potentially interested institutions in connection with the sale process and the details thereof, including whether the nondisclosure agreements contained standstill provisions that currently preclude any institutions from making a topping bid; and

(d)    any and all information regarding any discussions and negotiations that took place pertaining to Board members' positions on the board of directors of the combined company, Chemical's employment services agreements with Torgow, Provost, and Klaeser, or any other Talmer officers, directors, or executives following a strategic transaction, including, but not limited to the timing, content, communications, and parties to such negotiations.

85.    Defendants' failure to provide Talmer shareholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.  The Individual

Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Registration Statement.  Absent disclosure of the foregoing material information prior to the shareholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

86.    Unless enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties to Plaintiff and Talmer's other public shareholders, and may consummate the Proposed Transaction, to the irreparable harm of Plaintiff.

87.    Plaintiff is immediately threatened by the wrongs complained of herein, and lacks an adequate remedy at law.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

88.    Plaintiff repeats all previous allegations as if set forth in full.

89.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

90.     During the relevant period, defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

91.     Defendants issued the Registration Statement with the intention of soliciting shareholder approval of the Proposed Transaction.

92.     By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Registration Statement.   The Registration Statement was prepared, reviewed, and/or disseminated by the defendants.   The Registration Statement misrepresented and/or omitted material facts as alleged above, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's and Chemical's assets.   In the exercise of reasonable care, Talmer

and the Individual Defendants knew or should have known that the Registration Statement was materially misleading and omits material facts necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

93.    The defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.  The defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

94.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to shareholders.   If those misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Transaction, Plaintiff and the Company's other public shareholders will be deprived of their right to cast an informed vote.

95.    By reason of the foregoing, the defendants have violated Section 14(a)

of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

96.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

97.     Plaintiff repeats all previous allegations as if set forth in full.

98.     The Individual Defendants acted as controlling persons of Talmer within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Talmer and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

99.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to

be corrected.

100.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Individual Defendants prior to their approval of the Proposed Transaction.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

101.   In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

102.   By virtue of the foregoing, the Individual Defendants have violated Section20(a) of the Exchange Act.

103.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparable harmed.

104.   Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that defendants' conduct threatens to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of the Class, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Declaring that defendants violated Section 14(a) of the Exchange Act;

C.     Declaring that the Individual Defendants violated Section 20(a) of the Exchange Act;

D.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, until such time that

the Individual Defendants have adequately undertaken all appropriate and available methods to obtain a transaction which is in the best interests of Talmer's public shareholders and remove any conflict of interest that has clouded the process and the Individual Defendants' judgment and defendants disclose the material information which has been omitted from the Registration Statement;

E.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

F.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees and expenses; and

G.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

[Signature follows]

42

Dated: April 27, 2016                    **WERNETTE HEILMAN PLLC**

                                         /s/ Michael R. Wernette
                                         _____

                                         MICHAEL R. WERNETTE (P55659)
                                         Local counsel for Plaintiff
                                         24725 W. 12 Mile Road, Suite 110
                                         Southfield, Michigan 48034
                                         (248) 663-5170
                                         mike@wernetteheilman.com

                                         **WEISSLAW LLP**
                                         Richard A. Acocelli
                                         Michael A. Rogovin
                                         Kelly C. Keenan
                                         Counsel for Plaintiff
                                         1500 Broadway, 16th Floor
                                         New York, New York 10036
                                         (212) 682-3025

# EXHIBIT 1

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned certifies as follows:

1.     The undersigned has reviewed a draft complaint against Talmer Bancorp, Inc. ("Talmer") and others and authorizes the filing thereof.

2.     The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.     The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     The undersigned has been, at all relevant times stated in the complaint, the owner of shares of Talmer, as set out in Appendix A hereto.

5.     The undersigned has not sought to serve or served as a class representative under the federal securities laws in the last three years except as listed below:

In re QR Energy LP Unitholder Litigation, Case No. 4:14-cv-02195

6.     The undersigned will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED: 04/15/2016

_____
Stephen Bushansky

**ADDENDUM**

| Purchase/Sale | Date | No. of Shares | Price Per Share | Transaction Cost |
|---|---|---|---|---|
| Purchase | 2/2/14 | 600 | $13.00 | $7,800,00 |